Good morning, Your Honor. Casey Wolnowski appearing on behalf of the appellant, John Lopez, in the case of Lopez v. Hollisco Owners' Corp, and may it please this honorable court. Your Honor, essentially what the district court did in this case was it misapplied the business necessity exception of, as for that defense, under the Americans with Disabilities Act. For hepatitis? Yes, Your Honor. What kind of building was this? It was a co-op in Queens. So how is that not a threat to the health of the people who live there? Based upon the proof which was submitted to the district court, namely, the only proof which was submitted was that of a report by a Dr. Carlos Salama, who's a doctor of infectious diseases in Elmhurst Hospital in Queens, who reached the conclusion that he posed absolutely no threat whatsoever. But why does the building charged with scientific knowledge like that? He tells them he has a condition, and they say, we don't know enough about it. Get a doctor's letter. And then you come in at a trial months later and say, you know, it really wasn't contagious. But how is the building chargeable with that knowledge? What the U.S. Supreme Court and what this court has held is that there must be an individualized assessment. There must be an evaluation which is based upon objective medical evidence. And in undertaking that evaluation, the U.S. Supreme Court has urged that an employer has to look at four things. They have to utilize, again, objective medical evidence. Did he ever bring the note in? He was told, just get your doctor to bring a note in. Did he ever bring the note in? He never went to go see the doctor. And as he stated at the oral argument, he said he didn't feel as though he had to. I thought he did go to a doctor and got a note which he actually submitted to the unemployment insurance people. What he did was, that was in April, Your Honor, and that was after he was fired. What happened was, unemployment insurance said, in order to collect insurance benefits, you have to be ready to return to work, as opposed to having total disability, which then you can't return to work. He got that for unemployment in April 8th of 2014, which postdated his termination by 15 days. When the Supreme Court said there has to be objective evidence, what kind of condition was in their case? In Bragdon? The one that you just quoted. I don't recall exactly the ailment which was the effectant ailment in Bragdon, but the court urged that there has to be some assessment based upon the objective medical proof. But what do you think we should require an employer to do? If a fellow comes in, let's say he mentions a disease that the employer never heard of. I guess they've heard of hepatitis. But he says, well, he says, I have Zika. They've heard of Zika, but they certainly don't know all the medical stuff about Zika. So they say, we don't know. Get a doctor's letter. What the employer should have done is the employer should have said, Mr. Lopez, we don't know what hepatitis is and what it causes and how it could affect employees as well as by extension their families, because that was what Ms. Centennial said was the risk. Go home. It's paid leave for now. We have to engage in an assessment based upon the objective medical proof. Oh, but they would send him home. You said go home. Yes. And get a letter. Paid. So is this whole issue about the two days that it took him to get the letter? Is that what the case is about? No, it's about the fact that they put an unlawful condition on his continued employment with the company. But you just said they could send him home to check it out. If it was paid leave. So the only difference is it wasn't paid leave. Wasn't it two days? He was told to leave on the 28th, and they said, bring a letter demonstrating that you don't have hepatitis no later than March 22nd or else it could result in termination. And when he didn't, they fired him on the 24th. So what's the gap there? The gap would be 22 days. Twenty-two days. Because that's a long time to get a letter, isn't it? I mean, maybe he's entitled to pay for the reasonable time it takes to get a letter. Correct. While they conduct an individualized assessment. But the individualized assessment starts with his bringing a doctor's letter, doesn't it? They don't have to hire a doctor. They've said, go to your doctor. He knows you. Come back and tell us what he thinks. It's not necessarily hiring a doctor, but it's informing themselves. So what do you think they should do? Is it enough? Suppose they look on WebMD. I mean, they go on the Internet and get some scary information that's totally bogus. Have they done enough? Do they have to get it right? I think that that would be a question of fact, and I think that that's subject to a negligence standard is what evidence was out there, what did they reasonably think was out there, what did they do to find out? So the only safe thing they could do is hire a doctor, right? Because if they just go and do their own half-baked research as laypeople, checking out a few websites, they are at risk that a jury will think they should have done more. It would all depend on what they found and what they relied upon, yes. Because under the circumstances here, there was absolutely no risk whatsoever that it was to anybody. I understand there's something of a difference of fact about what he was told about the letter, an issue of fact, right? I would submit that there is, Your Honor. So suppose the issue of fact were resolved in the direction that a jury found, or based on all the documentary evidence it was clear, that what they said was bring a doctor's note that says you're okay to work. In other words, not that you don't have hepatitis, but either you don't have hepatitis or you do, but it's not really a risk to anyone. If they said that, would you still be here making the same argument? Had there been an issue with his fitness to perform the essential functions of his job? It is with the – Well, I think part of the – are we ignoring that one of the essential functions of his job is not to infect the other workers and the people who live in the building? Yes. That is, if he has a disease which could pose a threat, which he did not. Right. So what I'm asking is if it were clear that the building said go and get a doctor's note that says it's okay for you to come back to work, would you still have a problem? Yes. No, I wouldn't have a problem. If there was an issue with respect to his ability to perform the essential functions of his job, which necessitates under the essential functions not infecting others. Are you questioning whether that is one of the essential functions? Is that an issue? No, but it would have to be something that objectively would pose a risk and that not – Well, I don't think you're answering my question. I'm sorry. Maybe I'm not being clear. He comes and says, I have hepatitis. If the building – I understand there may be an issue with the people saying come back with a note that says you don't have hepatitis because that's kind of prejudging the issue of how dangerous hepatitis is. But assume for the moment that there was no issue of fact and that it was clear that what they said was, oh, you have hepatitis, go to your doctor and come back with a note telling us that you are okay to work. I would answer that question, Your Honor. I would say, yes, that's okay so long as having hepatitis affects performing the essential functions. But he's going to come back with a note that says it doesn't. It's okay. You can go back to work. Listen, people. He has hepatitis. It's very unfortunate for him, but the only ways it spreads are – he has the one that only spreads through blood contact. The risks of contagion are minimal. He should be allowed to come back to work. If that's what the doctor says, are you telling me that because, objectively speaking, there was no danger, they should never have sent him home in the first place and they're liable for the interim? I think that it is a cause of action to inquire as to the medical circumstance of somebody, but under those circumstances – But they didn't inquire. He told them. He says I've got a disease, right? And they say, oh, well, we're concerned about that disease. The question is, are they allowed to send him to say get clearance from the doctor that it's safe for you to come back to work, or are they not? Say that it's okay to come back to work? Yeah. Yes, but under the circumstances in this case, that isn't what happened. They said – Well, there's an issue of fact, apparently, as to what happened. So you're saying it's different if they say go get a note that says you don't have hepatitis because that wouldn't help him because he's going to get a doctor's note, apparently, that says he does have hepatitis. And then he couldn't go back to work. And then he couldn't go back to work at all. So is that the thing that we're focused on here? Could be a distinction, yes. His claim before the district court was essentially a claim for wrongful discharge, right? Correct. That's how the district judge understood it. That is correct. Did you try it or was somebody else? No, I did, Your Honor. All right. Well, whoever tried it. Was there ever a claim in the district court for the money for the days it would take to get a doctor's note? Did the district judge ever understand or given that that's part of the claim? Part of the remedies for a violation of the ADA in New York City human rights law is the back pay. Oh, yeah. I understand it may be available. My question is did anybody ask the district judge for that in this case? Yes. I mean, not explicitly, but it was requested. Well, where was it implicitly? Well, the damages for under an ADA claim are the back pay, the term in which he was out, which he should have been out. Well, I know. But if you just say, Judge, there's a statute out there, give us whatever the law requires, that doesn't really help him. In other words, you never said, Dweinstein, we think there's wrongful termination. And even if there isn't, give us at least some pay for those days when he should have been with pay instead of without pay while he was getting the doctor's letter. That claim was never raised, right? Well, there was the we did seek back pay. To the extent back pay was sought, the answer is yes. But explicitly alerting Judge Weinstein at some point that we wanted the money for the time that he had to get the letter plus the time after he was fired, I'm not sure it was ever explicitly stated the way that Your Honor has articulated it. Back pay would mean from the time he was allegedly wrongfully fired until the time he was reinstated. That was back pay, right? It's also our position that he was unlawful. There was an adverse employment action by virtue of his unpaid suspension. He was suspended on February the 28th. It said you cannot return and you will not be paid. That's undisputed. It's in the text messages. You have to leave. You will not be paid until you can prove to us that you don't have hepatitis. Right. So that would be the gap between that day and a reasonable time to get a letter, a matter of days. Sure. I guess. However long a reasonable person takes to make a doctor's appointment and have blood work done and then the blood work to come back. But, I mean, you're saying, I think, that what they said was wrongful in the first place, that he was right that he didn't need to get a doctor's note that says you don't have hepatitis. That's correct. That was an unlawful condition which was placed on his employment, and his failure to abide by an unlawful command is not a defense under the ADA. He believed that he had always consistently performed his job at an exceptional level, which was substantiated by his supervisor. But that's irrelevant, right? He could be the greatest worker in the world if he did have a disease that was highly communicable and would be transmitted to and would damage the people in the building. It wouldn't matter that he was a good porter rather than a bad one. Absolutely. If he had Ebola, completely different circumstance. Right. But I don't see any distinction factually from the present scenario as if he walked in and said, boss, I think I have AIDS. It would have been identical if they said, well, you have to leave, and the only way we can have you continue work here is if you demonstrate to us that you don't have AIDS. What would the jury instruction be? I mean, I take it one issue with respect to AIDS is that by this point, we're all much more knowledgeable about the risks and non-risks of someone who's HIV positive, and I would have a hard time imagining a jury saying it was reasonable for an employer to be ignorant on that subject. So in this instance, where perhaps it's a little less clear, would the jury be instructed what? That they have to have taken some reasonable step to inform themselves about the disease that he has proclaimed he had? Yes, Your Honor, and it would come down to whether the jury, the fact finder, determines was that reasonable. But in this circumstance, I think the facts are undisputed. They did absolutely nothing. Well, we're not here on your appeal of the denial of summary judgment. So in your favor, we're here on your appeal of summary judgment granted the other way. So we don't have to decide that as a matter of law they did something wrong. We only need to decide that there are issues of fact such that a reasonable jury could find in your favor. I did appeal both. You did appeal both. So you think you should get summary judgment here? I do, and at minimum to demonstrate that there are tribal issues of fact, because rather than rely upon objective medical evidence, they relied on subjective non-medical evidence. And what was, I think, troubling about the district court's decision, respectfully, was that that pervades the analysis and the inquiry which must be undertaken. Is there any disease that would be so obscure that an employer could legitimately say, I've never heard of this, go get a doctor to tell me, you know, what this is and if you're safe to work? Absolutely. There would be. So does that not suggest there is an issue of fact for the jury about whether hepatitis is in that category? Yes, there is an issue of fact. I think that there is a significant percentage of it. But then you wouldn't be entitled to summary judgment. I think that there's certainly questions of fact. Maybe doing a full reversal and granting summary judgment in our favor is maybe a stretch, but at minimum I think that there are tribal issues of fact. What do you do with the cases the district judge enlisted for the proposition that failure to get medical clearance is a legitimate non-discriminatory reason? He's got either five or six cases. Are those cases wrong and you honestly disregard them, or are they right but irrelevant? They are all distinguishable, Your Honor. They involve a completely and totally different circumstance. Anytime there is an employee who has an issue with being able to perform the essential functions of his or her job with or without an accommodation, right? So, for example, if somebody takes leave and says, I can't perform my job because of my disability, I'm going to be out for three or four months, and then comes back and says, I'm ready to work again, it is perfectly lawful for the employer because there was an issue of the disability causing that individual to be not able to perform the essential function to visit her job with or without an accommodation, to say, you first need clearance. We need to make sure you are able to perform the essential functions of your job. Therefore, we need you to either get a doctor's note or... Why can't they do that on day one? Why do they have to wait the four months? Why can't they say that to him on day one? Because there was never an issue about whether or not he could perform his job with or without an accommodation. Well, I understand that. We said his job involves not infecting people. Suppose he came in and said, oh, I have a really bad flu today. And they said, go home and don't come back until you have a doctor's note saying you're okay. It's not a disability. So that's the only... So suppose there was a super flu that came along that is so bad that it constitutes a disability. So if he's got something even worse than an ordinary flu that is as communicable as ordinary flu, then they couldn't send him home. It's tough to say yes or no one way or the other, but that's why I think the Supreme Court has utilized that individualized assessment, which relies on objective medical evidence that looks at four factors, duration, risk, severity, and probability of infection. And the burden is on the employer to do the research. The burden, if they're asserting an affirmative defense, which is business necessity, then the burden is on the employer to demonstrate they did this. This court has said that in Hargrave, which I cited in my brief, that they have to undertake that burden to demonstrate. And there was absolutely no undertaking of any assessment. I think I'd be remiss not to say this, though it may not have anything bearing on the merits of the lawsuit, but as with many lawsuits, one sometimes gets the impression, if everyone had behaved like adults, we wouldn't be here. Like, why didn't he come back with a note that says, there's no real problem with hepatitis, guys. You're acting out of ignorance and superstition. And then maybe there would be a negotiation of whether he should have been paid for the couple of days it took to get the note, and then the case would be settled. But instead, there's this resort to standing on one's rights, which may not be one's rights, and either he winds up imposing liability on an employer that's not, you know, it's not IBM. It's not somebody that's got a human resources department and professionals on call to do all this stuff. It's a little building. And so either they get saddled with a big liability, or he gets nothing and is fired. And that's how litigation goes. It is to me, you know, one of the things we see all the time, that people don't have common sense about resolving disputes like this. What he should have done is gone to the doctor, who would report back, hey, no problem here. And then we'd be, assuming you're right about it, I'm not a doctor. I don't know how contagious hepatitis is. The most I've got is Internet research on that subject. And you're an expert, I guess. That may have been sufficient. And I think that's a question of fact, that if they had said, look, we sent him home. We did a bunch of research on WebMD. We Googled it. I called my friend whose husband is a doctor. He told me A, B, C, X, Y, and Z, and then we made the determination. But that was never done. Can I just ask you about the facts in a light most favorable to your client, which is his deposition, just what happened here? And I'm on Appendix 28. It starts off that day with his telling his supervisor, Mr. Riley. Riley said, you don't look so good. And he says, yeah, I think I'm sick. And then he tells him, I said I felt like I might have hepatitis C. And then he said, why do you think that? And he said, well, I was diagnosed for it in the 90s, right? False diagnose, but I was diagnosed. And then he's visited by Ms. Santinello two hours later, and what did she say? And this is his testimony. She wanted me to get clearance for hepatitis B or C. She didn't say, if you have that, you can't work here. She said, I want you to get clearance for hepatitis B or C. And then his question was, were you told if you got clearance you could come back to the premises? Not right then, no. But at some point she said she was going to talk to the board and see if I was capable of coming back. And at some point, this is the question, at some point did you get clearance to come back? I didn't get clearance for hepatitis B or C. So there's no record that they said to him, if you have hepatitis B or C, you can't work here. They kind of said, we don't really know what this means, just get clearance for it, which means if the doctor comes back and says, look, he has it, or if he doesn't have it, great. If he does have it, it's not a problem for the people he works with and the people he works for. Those are the facts in the light most favorable to you. That's Lopez's deposition testimony. He said, you need to leave and get clearance to see if it's hepatitis B or C. That was in the text message which was sent later on that afternoon around 2 or 3 o'clock in the afternoon. No, he said, question, were you told if you got clearance you could come back to the premises? Not right then, no. Question, were you at some point told that? She said she would discuss it with the board and see if I was capable of coming back. Question, at some point did you get clearance to come back? Answer, I didn't get clearance from hepatitis B or C. It was page 28 of the appendix. Those are his words. Correct. And then if I could direct the Court's attention to page 120 of the appendix. That's when she stated, this is that same day, later on in the afternoon, where Ms. Centennialo text messaged Mr. Lopez and said she spoke with Kenny Spencer. He advised the following, until we receive clearance, you cannot come back to work. So you will be unable to work the weekend because he was scheduled that weekend. No, I agree. I've seen that, too, and I understand that. I'm just saying clearance is different. This is a fine point. Clearance is different from saying you have hepatitis B or C. I think that's dangerous. You have to leave. She said, we don't really understand the implications of hepatitis B or C in this environment where you see tenants and coworkers. Just go get clearance, which means the doctor comes back and says, yeah, he's got it, but it's of no danger to anybody. Okay, fine. He can go back to work. That was the implication of what she said to him, right? I would respectfully disagree. I don't believe she ever articulated in that manner. She said, according to my reading of the deposition, was you need clearance of hepatitis. You told PJ that you had hepatitis. You need to go get clearance. So it all turns on clearance of versus clearance for? Well, she later on text messaged him and stated explicitly, you cannot come back to work until you are cleared of hepatitis. Where is it? It's not on page 120. So maybe it's somewhere else. Can you show me where it is? Until we receive the clearance. You cited me to appendix 120. It just says, until you receive the clearance, you cannot come back to work. It doesn't say clearance that you don't have hepatitis. Is there some other text message that you're referring to? Well, the text messages, when viewed in their entirety, demonstrate that she said you cannot come back to work until you provide clearance for having hepatitis. Where does it say that? It says, you are cleared to work. Those are her words, right? 121 of the appendix. And then he says, okay, as long as I'm getting paid. She says, you're not going to get paid. It also says, until you're cleared to work. It doesn't say, we don't care what the doctor says about hepatitis. If you have it, you can't work. This is a fine point, right? You get my point? I think that there can be several interpretations of their exchange, but I think viewing the entirety of their communications, it was clear to Mr. Lopez that he could not work until he was cleared of hepatitis. He had to demonstrate to the employer. Clearance to return to work, not cleared of hepatitis. That's my point. Where does it say clearance that you must get something that says you don't have hepatitis? Where does it say that? In his own deposition. Well, the text messages in light of their conversation and the letter which arrived a couple days later that said, we need a letter stating that you are fit and able to return to work. Mr. Lopez testified that he understood fit and able to return to work to mean clear of hepatitis. Well, maybe he misunderstood it. On appendix 123, the employer says, and maybe at this point she's got a little more knowledge, I need him to give you clearance in regards to your health and to clarify if you have type B or C. Does it matter whether he has B or C? Now, my little internet research, maybe your expert will tell us something different so I want to know, says that hepatitis C is more like HIV in the sense that it's spread via blood. It's even harder than HIV. It's not spread via semen or other bodily fluids. But hepatitis B is spread through blood, semen, or certain other bodily fluids even in microscopic amounts. That sounds to me like hepatitis B may be much more communicable than C. What does your expert report say about the difference between B and C, if anything? As to the extent that it relates to transmissibility, he states that it was remote to the point that it was almost nonexistent. For B, specifically for B or C. Thank you. You have some time to respond. Thank you, Your Honor. And I understand one of the defendants would like to respond today. Is that right? Good morning, Your Honors. My name is Emil Saman from Kagan Lubbock. We represent Holistic Owners Corp., and I just want to clarify some of the points because I think when Mr. Linsky argues that it happened in the lower court, some of the facts get skewed a little bit. The conversation that his client, Mr. Lopez, had with PJ, the super, that led to this whole case was based on the fact that Mr. Lopez hadn't been performing his job duties. He asked to speak with PJ because he had to leave that day, and he then advised that he thought he might have hepatitis, which PJ then went to the management and said, you know, he advised me he might have hepatitis. At no point, and we can look at the letters, and we keep talking about clearance for hepatitis, clearance for that with the doctor's note, the doctor's note says we just need to know that you're fit and able to return and perform your job duties. There was nothing about we need to know if you don't have hepatitis or you do have hepatitis. The note said if you are fit and able to return to work. Well, no, that's not quite true. I was just reading with Mr. Woodward the note or the text message on 123 of the appendix. It says to clarify your health and to know whether you have B or C. They're specifically asking for a diagnosis. I'm not referring to the text message. I'm talking to the official letter that was sent to Mr. Lopez telling him that he could return to work if he was fit and able. And that's what the district court looked at as well. And where is that in the appendix? I'm not sure which appendix. 125, I think. 125. There was a letter sent, I think, March 4th. March 3rd. From Mrs. Santanella to Mr. Lopez. Now, by that time, he had gone to the doctors the preceding Friday because he sends a text to her saying, Jen, I'm at the doctors trying to get a note, trying to get the note. He needs to know what you need in order for me to go back to work. And he did get the note, and he submitted it to unemployment, but he never submitted it to management or the board or the co-op. And, I mean, as a side note, unemployment determined that he wasn't terminated and he didn't receive unemployment, and that's when this action was started. But one of the key things in this case is if there's an adverse employment action. And if you look through the deposition testimony, and in our brief it's cited in numerous occasions, even by Mr. Lopez himself, he was never terminated from his position. He states in his deposition testimony, the question was asked, at any point, no matter what, were you not allowed to come back to work? And he states specifically, no. The full sentence was, the question was, and I know this might be repetitious a little bit, but I want to ask in a more clear manner, at any point, were you told no matter what, you were not allowed to come back to work? And he states specifically, no. He was never terminated. He chose. And that says on the next page of your brief, I did go to the doctor and I got clearance to come back to work, physically fit to work. Did you send that to Ms. Santinello? It's on page 10 of your brief. Yes. I think I sent it to unemployment, but you never sent it to Ms. Santinello, not that I recall. Yes. He never submitted the note to management or Ms. Santinello or the board, which if it had said he was fit and able, as that letter indicated, he would have been able to return to work. So he made a conscious decision not to submit the note, and theoretically by the law, and it's cited in our brief, that could be deemed abandonment of his employment, and the district court found in that favor as well. Now, as it relates to them requesting the note, the district court held that there was no issue with them requesting the note, because all they were trying to do to see if he would be fit and able to return to handle his job duties. And the courts have held that as long as it's the ADA permits an employer to require a medical examination and to make inquiries as to an employee's medical condition where the examination or inquiry is shown to be job-related and consistent with business necessity. Now, this is multifaceted. One, they were already questioning whether or not his performance on the job. He had left a few times. He had called in sick a bunch of times. Then as it relates to what was brought up before by Your Honors, with hepatitis B and C, Ms. Santinello is not a doctor. She does not know what the risks are involved. They have shareholders. He's in and out of the apartments. He has contact with other employees. It was cited in my co-defendant's brief. They're not here today, but they represent the management. There were numerous instances where he did get injured on the job and he did have cuts. He had to be taken to emergency care one day for an injury that occurred on the job. So there were some risks involved with that, and all they were strictly seeking was to whether or not he would be able to perform his job functions and wouldn't be a risk to the shareholders or the other employees. May I ask, have you folks participated in mediation in this court? No, Your Honor. If you were interested and the parties sent us a letter, I can't speak for my colleagues, but I would guess that we'd be willing to hold up on deciding the case and let you do that. We've heard a lot about potential issues of fact and so on. If this case, all we need to do is send this case back to the district court, and that would satisfy Mr. Woodward for now. And then, of course, there is attorney's fees piling up, and however the case ultimately comes out, your client winds up spending a lot of money. And God forbid, from your standpoint, the plaintiff winds up winning. Not only do you owe him money, but there's all the attorney's fees on the other side. One might think this is a case that could be settled. One might think that. Now, of course, it doesn't make any difference to me. If we have to decide the case, we'll decide the case. It will go how it goes. You know, you think you're likely to win, and you want to have that decision made. God bless you. There's no pressure here. I'm just wondering if this is something that's even presented itself to the – if this is something that has not presented itself to the parties before. We do have a mediation program next to the court, and that might be something that people could think about. But I'm not – no pressure. I'm just saying, if this has never occurred to anyone, now it is occurring to you, and you can decide for yourselves whether there's any point in doing that. Not for the amount of damages that were requested. It would be – Yeah, well, that's how mediation works. I understand. One side says, I want the moon, and the other guy says, no, you get a pebble. And then maybe it works out, and maybe it's three pebbles, or maybe it's half a moon. I don't know. But that's how negotiations and mediation happen. Of course, they're asking for more than you think is reasonable. And, of course, if you have made any offers, they don't think that dignifies a response. A mediator might help. That's the only thing I'm saying. Go back to your argument. I just raised the point. Well, my client really does not think he was discriminated against. They believe that. They were looking out for the best interests of the other employees, of the other workers. Everybody believes they're in the right. Sometimes it's a lawyer's job to tell the client, yeah, well, there's justice, and there's also, you know, how much money you're going to be spending to get justice. You don't think you're even at risk for a few days where you suspended him without pay? I think if that was brought to the table a while back, I think that would have been a no-brainer. I mean, that case would have been developed. Well, it may be a no-brainer, but if he wins on that, he gets attorney's fees. He wasn't actually asked that, Your Honor. If you look at his complaint, he's asking for back pay. Well, he says he did. He says back pay includes a short period of back pay. No, because he put a chart in his papers that specifically listed back pay. All I'm pointing out is that if he were to win on even a few days, he'd probably get attorney's fees, which my guess is are a lot more than a few days of back pay. I understand, Your Honor. Anything else you had? No, Your Honor. That's it. Okay, we have rebuttal for Bitt. Thank you, Your Honor. There's just a few points I wanted to raise. With respect to the letter, the March 3rd letter, which stated that you need a note which says that you are fit and able to return to work, Mr. Lopez testified that he said he understood fit and able to return to work to mean clear of hepatitis and furthermore. You know, if somebody sends you a letter that says get me a doctor's note that says you are healthy or get me a doctor's note that says whatever, and you interpret it as meaning something that it plainly doesn't say, what you interpret it as isn't the point. The point is how would a reasonable person take this? Now, if you want to make an argument, I think it's a plausible argument, that in light of the communications that had come before, it was reasonable for him to understand that, or that's how we should understand it, okay. But what he thinks is pretty much irrelevant, isn't it? Well, I think it's viewed in light of the context of everything that had happened. But furthermore, what I think is very important, this is on page 79 of the appendix, page 59 of the deposition, I asked Ms. Centaniello a question, when you say in your note, this is the March 3rd letter, in your letter that he had to provide a note saying that he is fit and able to return back to work, is it fair to say that you meant that he had to be cleared of hepatitis B or C to return to work? Answer, I believe so. So that's exactly what she intended fit and able to return to work to mean, and that's exactly how we understood it. She had defined what fit and able to return to work meant, and that's precisely the way that he understood the letter. So in terms of the communication between the two people, the writer meant it a particular way, and the reader understood it that exact way. A few other points in terms of, I would like to just note, because there's been discussion about some settlements, I won't get into numbers, I think we've always been very reasonable and open to that, and it's the defendants who have been really unwilling to participate in any kind of reasonable settlement discussions. This issue about he was having performance concerns with being able to perform the essential functions of his job, the record would demonstrate that he was suffering from fatigue, and the reason he was was because he was having to come into work in the morning at 3 or 4 in the morning to plow the driveway of snow before people left for work. That was what prompted him to have a conversation with Mr. Riley, and really this focus about how he was a bad employee is only being raised for the first time on appeal, and quite frankly there was no discussion about this prior to now. But he was a bad employee. You said he was injured in the past and was taken to the emergency room, and he was tired. He looked like he was tired, and Riley as the supervisor said, what's the matter? That's the record, right? Nobody said you're a lousy employee and that's why we're firing you. Well, there were issues I think raised in the brief regarding his work performance, but I think those are belied by the totality of the record, which demonstrates that he was an exceptional employee. In fact, his supervisor said that he would give him a 10 out of 10 as an employee. Also, with respect to the note that he got saying that he was fit and able to return to work, he never delivered that to the employer because that's not what he understood that they wanted. And furthermore, that note was only received after he was fired, and it was in response to a request by unemployment to say, well, in order for you to obtain benefits, you have to be able to return to work. Well, he was at the doctor. He sent a text message from the doctor, doctor's office, right? He did. He went to the doctor's office at that point saying, okay, I've been told to go to the doctor's office. Went to the doctor's office. The doctor's like, well, why are you here? And that's when he texted Ms. Santaniello saying, well, what do you need? And then he couldn't have that procedure done that day and left, and then essentially he got scared. What was the procedure? Whatever procedure I would imagine is needed to get a clearance to determine whether or not he had hepatitis, which I would presume is blood work and then tests which are done thereafter. Then you perform a blood test. There's a lab tech who performs the analysis, and then thereafter the results are sent. So the doctor didn't say, it doesn't matter if you have hepatitis B or C, you can go back to work? The doctor didn't say anything. When he went to the doctor, the doctor said, okay, why are you here? And Mr. Lopez didn't know because he didn't know what the procedure was, so that's when he text messaged Ms. Santaniello saying, what is it that I need from the doctor? And that's when she responded and said, you need a clearance as to whether or not you had hepatitis B or C because there are employees that are afraid for themselves and their families. Okay, thank you. Your time has expired. Why don't you, if you could send us a letter one week from now to say whether you're interested in the mediation program and send copies to our chambers. So send it to the clerk's office, but copies to the chambers of the three judges so we're aware of it. Well, I don't know where your offices are. Since you're in the building, they'll see you today if you want. Save yourselves a trip. I'm missing a party. Oh, you're missing a party. I'll do that. Thank you very much. Don't worry about it. Just notify us within a week, okay? Will do. Thank you, Your Honor. Thank you. We'll reserve decision on this case.